# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| KOLBY DUCKETT, <br> DAVID SCHILLING, and <br> DAVID HOLLOWAY, | * <br> * <br> * <br> * | |
| Plaintiffs, | * <br> * | |
| v. | * <br> * | Docket No. 1:19-cv-00295 |
| CHIEF BRIAN HICKMAN, individually, <br> and in his official capacity as the Police <br> Chief of the City of Collegedale, | * <br> * <br> * <br> * | |
| TED ROGERS, individually, and in <br> his official capacity as the City Manager <br> of the City of Collegedale, and | * <br> * <br> * <br> * | |
| THE CITY OF COLLEGEDALE, TENNESSEE, <br> a municipality. | * <br> * <br> * | JURY DEMAND |
| Defendants. | * | |

## COMPLAINT

**COMES NOW**, the Plaintiffs, Kolby Duckett (Officer Duckett), David Schilling (Officer Schilling), and David Holloway (Corporal Holloway) by and through their attorneys, Davis & Hoss, P.C., and hereby files this Complaint for damages against the Chief Brian Hickman, individually and in his official capacity as Police Chief of the City of Collegedale; City Manager Ted Rogers, individually and in his official capacity as City Manager of the City of Collegedale; and the City of Collegedale, Tennessee, a political subdivision of the State of Tennessee. The Plaintiffs would show unto the Court as follows:

1

## INTRODUCTION

1.      This is an action for Constitutional violations and violations of Tennessee State Law as a result of the termination of the Plaintiffs' employment by the Defendants which include Chief Brian Hickman, City Manager Ted Rogers, and the City of Collegedale.  This action is brought pursuant 42 U.S.C. § 1983, the Tennessee Public Protection Act (TPPA), Tennessee Public Employee Political Freedom Act (PEPFA), and vicarious liability/respondeat superior.

2.      At all relevant times, Plaintiffs aver that they were police officers and public employees of the City of Collegedale, Tennessee.

3.      Plaintiffs also maintain that the named Defendants terminated Plaintiffs effectively in retaliation for exercising their Constitutional rights to freedom of speech, exercising their duties to enforce the laws of the state of Tennessee, communicating with elected officials in the City of Collegedale about their concerns that the City of Collegedale was violating certain Tennessee laws and the constitutional rights of their citizens, and for cooperating with a lawful criminal investigation into the administration of the Collegedale Police Department and the City of Collegedale by the Tennessee Bureau of Investigation.

## PARTIES, JURISDICTION, & VENUE

4.      Officer Duckett is a resident of Bradley County, Tennessee.  He served as an Officer for the Collegedale Police Department ("the Department") since on or about November 2017 until his termination on or about September 6, 2019.  At all times relevant, Officer Duckett was an employee of the City of Collegedale.

5.      Officer Schilling is a resident of Hamilton County, Tennessee.  He served as an Officer for the Collegedale Police Department ("the Department") since on or about February 2014

until his termination on or about September 6, 2019. At all relevant times, Officer Schilling was an employee of the City of Collegedale.

6. Corporal Holloway is a resident of Hamilton County, Tennessee. He served as a patrol officer and then Corporal since on or about November 2002 until his termination on or about September 6, 2019. At all relevant times, Corporal Holloway was an employee of the City of Collegedale.

7. Chief Brian Hickman, for all relevant times to this Complaint, served as the Police Chief for the Collegedale Police Department. Upon information and belief, Chief Hickman is a resident of Hamilton County and the Eastern District of Tennessee and can be served at 4910 Swinyar Drive, Collegedale, Tennessee 37315.

8. City Manager Ted Rogers, for all relevant times to this Complaint, served as the City Manager for the City of Collegedale, Tennessee. Upon information and belief, Mr. Rogers is a resident of Hamilton County and the Eastern District of Tennessee and can be served at 4910 Swinyar Drive, Collegedale, Tennessee 37315.

9. The City of Collegedale is a political sub-division of the State of Tennessee and was at all relevant times organized and existing under the laws of Tennessee. The City of Collegedale can be served at 4910 Swinyar Drive, Collegedale, Tennessee 37315.

10. The City of Collegedale operates within Hamilton County, Tennessee. All acts and omissions alleged in this Complaint occurred in Hamilton County, Tennessee which is located in the Eastern District of Tennessee. This case also involves constitutional violations as well as violations of state law, and therefore, jurisdiction and venue are proper with this Court.

## FACTS

11. The allegations in Paragraphs 1-10 are incorporated herein by reference.

3

11. Officer Duckett was a Collegedale Police Officer from November 2017 until September 6, 2019. At all relevant times, particularly the last several months of his employment, Officer Duckett worked in patrol on day shift.

12. Officer Schilling was a Collegedale Police Officer from February 2014 until September 6, 2019. At all relevant times, particularly the last several months of his employment, Officer Schilling worked in patrol on day shift.

13. Corporal Holloway was a Collegedale Police Officer from November 2002 until September 6, 2019. Corporal Holloway was the Corporal for day shift.

14. The City of Collegedale, through its Administration and the Police Department, has always had performance standards for its police officers to achieve. Emphasis has always been placed on traffic stops and the requirement that officers stop any car no matter how big or small the traffic violation.

15. As early as 2015, the Administration began documenting shift productivity of its officers. It began issuing directives regarding productivity, setting a certain number of activities that needed to be achieved on a daily, weekly, and monthly basis by its officers. What was once an "unspoken rule" about the emphasis on traffic stops and arrests that stemmed from traffic stops became a departmental directive in or around December 2018.

16. At that time, the Department, through its supervisors and administration, began directing patrol officers to achieve a certain number of "Enforcement Activities" per month.

17. Officers, including the Plaintiffs, were told by their supervising sergeant(s) that all patrol officers had a monthly requirement of twenty-five (25) "enforcement activities." This was also posted on a Department bulletin board at the Department headquarters. Enforcement activities were defined on the Stat Sheets as written citations (known to officers as D7/D8) or self- initiated

4

arrests (D9).  Supervisors within the Department made it clear to patrol officers that "enforcement activities" meant traffic citations and arrests that stem from traffic citations.  Further, officers were required to have one hundred (100) "patrol activities" per month.  Patrol activities were defined as "neighborhood and business patrols, school patrols, park and walks, and STEPS."  *See* Exhibit A, December 2018 Stat Sheet.  Supervisors within the Department began ranking officers at the end of each month, indicating those officers with the highest number of enforcement and patrol activities, and those officers with the lowest number.

18.     The Department specifically mandated its officers to achieve twenty-five (25) traffic citations or self-initiated arrests each month.  A self-initiated arrest is one that follows an officer-initiated encounter, i.e. a traffic stop.  What does not count towards an officer's twenty-five (25) monthly "enforcement activities" or the departmental definition of "self-initiated arrests" (D9) is an arrest that results from a dispatched call to a location, i.e. if an officer responds to the Wal-Mart on a shoplifting, investigates and then makes an arrest or a domestic violence in which a member of the public calls 911 and an officer is dispatched.  Again, this places the emphasis on traffic stops and arrests that stem from traffic stops, rather than arrests from dispatched calls.

19.     If an officer achieved those set numbers, they would be more likely to be considered for promotions, newer patrol cars, extra training opportunities, etc.  If an officer did not achieve this set number of traffic citations or arrests, then the Department would note the deficiency in the officer's personnel file known as "write-ups".  Plaintiffs aver that this is in direct violation to T.C.A. § 39-16-516 and against public policy in the State of Tennessee.

20.     T.C.A. § 39-16-516, effective July 1, 2010, states:

**§ 39-16-516. Traffic citation quotas**

(a) A political subdivision or any agency of this state may not establish or maintain, formally or informally, a plan to evaluate, promote, compensate, or discipline a law

enforcement officer solely by the issuance of a predetermined or specified number of any type or combination of types of traffic citations.

(b) A political subdivision or any agency of this state may not require or suggest to a law enforcement officer that the law enforcement officer is required or expected to issue a predetermined or specified number of any type or combination of types of traffic citations within a specified period.

(c) Nothing in this section shall prohibit a municipal corporation, a political subdivision or any agency of this state, from establishing performance standards for law enforcement officers that include issuance of traffic citations, but do not require issuance of a predetermined or specified number or any type or combination of types of citations as the sole means of meeting such performance standards.

(d) As used in this section:
(1) "Conviction" means the rendition of an order by a court imposing a punishment of incarceration or a fine; and
(2) "Traffic offense" means an offense under title 55.

21. T.C.A. § 39-16-516 strictly prohibits a political agency of the state from requiring an officer to issue a predetermined number of any type or combination of types of traffic citations within a specified period. The law further prohibits a Department from disciplining an officer solely for failing to meet a predetermined or specified number of traffic citations.

22. In November 2018, when the new policy was being discussed amongst the Administration, Corporal Holloway expressed his concern and fear that the Department would be instituting an illegal quota to Lt. Jack Sapp and Sergeant Jamie Heath. Their responses to Corporal Holloway were just to continue doing his job and leave it alone.

23. In response, Corporal Holloway took his concerns to Police Chief Brian Hickman. He stressed his fear and concerns that requiring officers to achieve a certain number of traffic citations and arrests that stemmed from traffic stops amounts to an illegal quota. He warned Chief Hickman that if they continued to initiate this policy, it would be illegal and the Department may get into trouble for it.

24. Chief Hickman responded that he would look into it.

6

25. Without hearing a response from Chief Hickman and with the policy going into effect in January 2019, Corporal Holloway felt he had no choice but to take his concerns to City of Collegedale Commissioner Debbie Baker. Corporal Holloway told Commissioner Baker about the new policy, about his fear of an illegal quota, and about his concerns of requiring officers to conduct traffic stops on citizens in an illegal quota system.

26. On January 3, 2019, Officer Kolby Duckett participated in a meeting with his supervisor, Sgt. Heath, and Cpl. Holloway. In that meeting Sgt. Heath outlined what the Department expected from its patrol officers. Sgt. Heath specified that there was a monthly requirement of twenty-five (25) enforcement actions (i.e. written traffic citations and self-initiated arrests) and one hundred (100) patrol activities.

27. On January 4, 2019, Sgt. Heath wrote Officer Duckett up for "failing to complete and/or submit the minimum standard requirements for Enforcement and Patrol activities during the month of December 2018. Duckett submitted eleven (11) activities in the Enforcement category and ninety-eight (98) activities in the Patrol category." *See* Exhibit B, Write-up from Sgt. Heath. Corporal Holloway also failed to meet his monthly enforcement and patrol activities for December 2018. On January 4, 2019, Sgt. Heath wrote Corporal Holloway up for failing to achieve those monthly requirements. These write-ups were placed in Officer Duckett and Corporal Holloway's Guardian Tracking file which is effectively a digital personnel file.

28. At this time, Officer Duckett was eligible to receive an upgraded patrol vehicle. He was next in line in a line of officers who were waiting to receive upgraded vehicles. The Department routinely uses upgraded vehicles as rewards to officers who perform well or who excel in their position.

7

29. Officer Duckett did not receive a vehicle upgrade in January 2019 but was instead passed over for an officer with less experience and who was further down the line. When Officer Duckett inquired about this, he was told to get his numbers up, i.e. conduct more traffic stops and he would get an upgrade.

30. On the day of his write-up, Officer Duckett voiced his concerns to an elected official of the City of Collegedale, Commissioner Ethan White. Officer Duckett informed Commissioner White of his fear that the monthly enforcement activity requirements amounted to an illegal quota in violation of Tennessee law. He also informed Commissioner White that officers, himself included, were being disciplined for not achieving a certain amount of traffic citations and arrests per month, which he felt was in violation of Tennessee law and amounted to an illegal quota system.

31. While Cpl. Holloway and Officer Duckett were being written up, Officer Schilling met his required monthly numbers of enforcement and patrol activities for December 2018. On January 4, 2019, Sgt. Heath placed an "officer compliment" in Officer Schilling's Guardian Tracking file notifying Officer Schilling of this accomplishment.

32. On January 6, 2019, after speaking with Corporal Robert Bedell and other officers within the Department, Officer Schilling voiced his concerns about the monthly requirements and whether they amounted to an illegal quota in violation of T.C.A. § 39-16-516 to Sergeant Westfield. Sgt. Westfield stated that he had been provided a copy of T.C.A. § 39-16-516 by Corporal Bedell who had also voiced his concerns about the legality of the new policy. Sgt. Westfield also stated that he would look into this with his superiors.

33. A day later, on January 7, 2019, Lt. Jack Sapp sent the Department an email, denying that the Department had initiated an illegal quota system. The email stated that the

8

enforcement activities included verbal and written warnings, not just citations or arrests.  *See* Exhibit C, Sapp Email.  This is in *direct conflict* with the stat sheets on the bulletin board as well as the verbal directives by the Sergeants to the patrol officers.

34.     Given Lt. Sapp's email in response to officer concerns, Officer Schilling took his concerns to an elected official of the City of Collegedale, Commissioner Ethan White.  Officer Schilling voiced his concerns about the illegality of the performance standards to the Commissioner in the hopes that immediate action would be taken.

35.     On January 8, 2019, following his conversation with Commissioner White on January 4th, Officer Duckett was called into Chief Brian Hickman's office while on duty.  During the conversation, Chief Hickman asked why Officer Duckett went to Commissioner White about the performance standards.  Chief Hickman went on to explain that Commissioner White spoke to City Manager Ted Rogers about issue and that Officer Duckett "needed to be careful about what he said to the Commissioners."  Chief Hickman also stated that he knew others had spoken to the Commissioners about the performance standards, but that he knew Officer Duckett was one of them because of his friendship with Commissioner White.  He further said that Officer Duckett needed to be careful about speaking to the Commissioners in order to try to change things within the Department.

36.     During that same meeting, when Officer Duckett explained how Sgt. Heath had described the monthly enforcement activities requirement, Chief Hickman affirmed that what was being explained was, in fact, a quota, and that officers could not be required to meet those monthly requirements as had been explained.

37.     After that meeting, Chief Hickman sent an email to the Department stating that due to the concerns being brought by officers about the enforcement activities, Chief Hickman was

9

reviewing the process to assure compliance with Tennessee law. He further stated that as of January 8, 2019, the enforcement activities requirement was "no longer in effect." Lastly, he stated that the Department would review the process and develop performance standards that take into consideration enforcement activities "as one of the many factors upon which officers will be evaluated." *See* <u>Exhibit D</u>, Email from Chief Hickman.

38. On January 10, 2019, Corporal Robert Bedell was terminated from the Collegedale Police Department. Corporal Bedell was told by Chief Hickman that City Manager Ted Rogers had instructed the Chief to terminate Corporal Bedell. Chief Hickman gave Corporal Bedell the option to resign in order to keep his POST certification. Upon information and belief of the Plaintiffs, Corporal Bedell was effectively terminated because he refused to remain silent about and refused to participate in the illegal activities of the Department who had implemented an illegal quota system and because he had taken those concerns to a public official, Commissioner White.

39. In February 2019, the January rankings came out and were posted on the bulletin board. Officer Duckett exceeded his monthly required numbers in enforcement activities, was given an upgraded patrol vehicle, and also received an "officer compliment" in his Guardian Tracking file from Sgt. Heath.

40. Corporal Holloway also achieved his monthly enforcement activities requirements for January 2019. When he achieved those requirements, Sgt. Heath placed an "officer compliment" in his Guardian Tracking file.

41. Over the months between January 2019 and July 2019, Officers Duckett, Holloway and Schilling continued to voice their concerns that the Department continued to operate an illegal quota system to elected officials, mainly Commissioners Ethan White and Debbie Baker.

42. Upon information and belief, these Commissioners communicated to the Administration of the Collegedale Police Department to include Ted Rogers and Chief Hickman and others, the concerns of these Officers.

43. The Plaintiffs began to feel as if the Administration started treating them differently because of their communications with the Commissioners about the problems within the Department.

44. Sergeant Westfield, during the spring of 2019, told Officer Schilling that the Plaintiffs were being referred to as the "cancer" of the department. He also advised Officer Schilling not to continue to talk to the Commissioners about his concerns with the Department.

45. Later on in May 2019, Officers Duckett and Schilling spoke with Lt. Sapp about the atmosphere at work and about some of the issues within the Department. In that meeting between a Lieutenant and his patrol officers, Lt. Sapp affirmed to Officers Duckett and Schilling as the "cancer of the department" and reiterated that they need to be careful about talking to the Commissioners about their concerns.

46. From that point forward, the Plaintiffs felt as though they had targets on their back because of their respective conversations with the elected officials of the City of Collegedale.

47. On July 3, 2019, Corporal Bedell filed a lawsuit in Hamilton County Circuit Court against the Chief, City Manager Ted Rogers, and the City of Collegedale for, among other things, retaliating against him for objecting to the illegal quota system to his chain of command and to an elected official. Officer Kolby Duckett was mentioned by name in the lawsuit as one of the officers who was disciplined for not achieving the monthly requirements in December 2018.

11

48.     Subsequent to the lawsuit, Hamilton County District Attorney General Neal Pinkston launched a criminal investigation into the Collegedale Police Department, the City Administration and its quota system.

49.     Officers Duckett, Schilling, and Holloway voluntarily interviewed with the TBI in July and August 2019.  These Plaintiffs provided documentation to the TBI regarding the quota system and how it was implemented and enforced throughout the Department.  They all gave evidence to the TBI that they believed the Department was implementing an illegal quota system. At all times, they gave truthful information responsive to the TBI's requests.

50.     Upon information and belief, the Plaintiffs are the only officers who were interviewed by the TBI and who provided evidence that was damaging to the City of Collegedale in their interviews prior to a search warrant being executed on the City of Collegedale. Specifically, these three Plaintiffs gave evidence that Collegedale was implementing an illegal quota system.

51.     Following the initiation of the TBI investigation, on July 18, 2019, City Manager Ted Rogers sent an email to the Commissioners, the City Attorney, and Michele Toro regarding various topics within the Department.

52.     Included in that email is a long statement about what Rogers calls the "Current Situation," i.e. the TBI Investigation/Bedell lawsuit.

53.     Rogers discusses how he is a former fire chief and that he is "quite skilled" at fighting fires.  He continues that he is "actively looking for the arsonist(s) who have matches and gas cans running around the City desiring to light fires."  *See* Exhibit E, Email from Ted Rogers.

54.     This email is in response to Corporal Bedell's lawsuit in which Officer Duckett was mentioned and the initiation of the TBI investigation.  Further, upon information and belief, this

12

email is also in response to these three (3) Plaintiffs cooperating and giving a statement in the TBI investigation and in response to Rogers' knowledge that the Plaintiffs have long voiced their concerns about this City and its Department to its elected officials. This email is a direct admission by the City Manager that he was trying to identify those who would speak out against the City of Collegedale and his plans to extinguish them.

55. On September 3, 2019, all three (3) officers were written up within the Guardian Tracking system for not checking the daily "Watch List" in June and August of 2019. In Guardian Tracker, this was deemed to be a "Counseling – Remedial" for not checking the watchlist.

56. Each officer responded in rebuttal to their chain of command.

57. Upon information and belief, as of the date of this filing, this "Counseling – Remedial" for each officer is the last disciplinary entry in their Guardian Tracking file.

58. On September 6, 2019, Officers Duckett and Schilling and Corporal Holloway were called into conference room next to the City of Collegedale Commission room. Officer Schilling was in the middle of drafting a police report and was told to stop immediately and step into the conference room and was unable to finish his arrest report. All three (3) officers were told at the same time that they were being terminated, effective immediately, from the Collegedale Police Department.

59. The Plaintiffs sought an explanation for their termination and were not provided one. The Chief further told them that their health insurance coverage through the City of Collegedale would terminate as of September 6, 2019 despite premiums being paid through the month of September.

60. As of September 6, 2019, all three (3) officers, including a seventeen (17) year veteran and Corporal with the Collegedale Police Department were terminated without cause or explanation and their health insurance immediately terminated.

61. On their Separation Notice provided by the City of Collegedale the next day, September 7, 2019, the City indicated that the reason for termination was "conduct unbecoming of an officer."

62. There was never an internal investigation into the three (3) officers nor was there ever any written documentation of conduct which would amount to "conduct unbecoming" as required by City policy.

63. The Plaintiffs were terminated because they refused to participate in and remain silent about the Department's illegal quota system. In addition, they were terminated because they communicated their concerns to elected officials within the City Commission of Collegedale. When these officers spoke up about the Department's illegal quota system both to their chain of command, then elected officials, then finally the TBI, Chief Hickman, Ted Rogers, and the City of Collegedale terminated their employment violating Tennessee law and Federal Law in the process.

## CAUSES OF ACTION

### I. *Count One – Violation of 42 U.S.C. §1983 – City Manager Ted Rogers and Chief Brian Hickman*

64. The allegations in Paragraphs 1-63 are incorporated herein by reference.

65. Pursuant to 42 U.S.C. §1983, City Manager Ted Rogers and Chief Brian Hickman jointly and severally, acted under color of law and deprived the Plaintiffs of their First Amendment

14

rights to the freedom of speech. Plaintiffs bring a claim against the above named officials individually, as well as in their official capacities, pursuant to 42 U.S.C. § 1983.

66. 42 U.S.C. § 1983 provides the Plaintiffs with a federal cause of action because the Defendants retaliated against the Plaintiffs when they exercised their right to speak as citizens of this District about a matter of public concern, i.e. the illegal and corrupt actions of the Department and the City of Collegedale.

67. The Plaintiffs, in speaking out about the illegal quota system to their supervisors, their elected officials, and to the Tennessee Bureau of Investigation, spoke on a matter of public concern as citizens of Hamilton County and the Eastern District of Tennessee.

68. The Defendants do not possess a legitimate interest that outweighs the importance of a public employee's right to speak about his belief that the actions of his employer violate the law.

69. The Plaintiffs' speech to their supervisors, their elected officials, and the Tennessee Bureau of Investigation was a substantial and motivating factor in their termination from the Collegedale Police Department on September 6, 2019.

70. Because their constitutional rights to free speech were violated, the Plaintiffs have suffered damages and are entitled to compensatory damages, punitive damages, and attorney's fees pursuant to 41 U.S.C. § 1988.

**II.     *Count Two – Violation of 42 U.S.C. §1983 – City of Collegedale***

71. Plaintiffs reallege and reincorporate by reference the factual allegations contained in Paragraphs 1-70 herein by reference.

72. The City of Collegedale, a municipality, can be liable under 42 U.S.C. §1983 if there is a well-settled policy, custom, or practice that was the moving force behind the Plaintiffs'

15

constitutional theory or if an individual with final policymaking authority for the municipality caused the constitutional deprivation.

73. Within the Collegedale Police Department, there is a commonly held belief that if an officer speaks negatively about the Department to an elected official, a member of the media, or other public official, that officer is in danger of losing their employment with the Department.

74. The City of Collegedale has created this policy, custom, or practice of silencing the speech of its employees and discouraging them from speaking with their elected officials about the actions of the Department. Further, officers have been disciplined or terminated based on their outward communications about the actions of the Department to elected officials.

75. It is this policy, custom, or practice that Ted Rogers and Chief Hickman relied upon when they terminated the Plaintiffs after they spoke to the Commissioners and the TBI.

76. City Manager Ted Rogers and Chief Hickman are the policymaking officials of the Collegedale Police Department. Ted Rogers, as City Manager, is the administrative head of the city government. His authority includes appointment, supervision, and removal of the Department heads of the City. In addition, the City of Collegedale Police Department Manual places the administrative control of the Police Department under the City Manager.

77. Pursuant to the City of Collegedale Municipal Charter, the City Manager's authority is enumerated in T.C.A. § 6-21-108 which states as follows:

The powers and duties of the city manager are to:

(1) See that the laws and ordinances are enforced, and upon knowledge or information of any violation thereof, see that prosecutions are instituted in the city court;

(2) Except as otherwise provided in this charter, appoint, promote, demote, suspend, transfer, remove, and otherwise discipline all department heads and subordinate employees at any time, subject only to any personnel rules and regulations adopted by ordinance or resolution by the commission. Any hearings on, or appeals from, the

16

> city manager's personnel decisions provided for in the personnel rules and regulations shall be exclusively before the city manager or a hearing officer designated by the city manager;
>
> (3)    Supervise and control the work of the recorder, the chief of police, the city attorney, treasurer, and all other officers, and of all departments and divisions created by this charter or that hereafter may be created by the board of commissioners;

78.    The Chief of Police answers to City Manager Ted Rogers. Upon information and belief, the City Manager considers himself the top of the chain of command for the Department and considers the Chief of Police to be the second in command.

79.    The Collegedale Municipal Code provides that all policemen shall obey and comply which the orders and administrative rules and regulations as the police chief may officially issue. *See* Exhibit F, Title 6, Chapter 1 of the Collegedale Municipal Code.

80.    The hierarchy of the Collegedale Police Department provides that the City Manager and the Chief of Police are the policymakers for the Collegedale Police Department.

81.    As the policymakers and the individuals with the authority to hire and fire officers, Chief Hickman and Ted Rogers are directly responsible for the decision to terminate the Plaintiffs in response to their communications with the Commissioners and the TBI.

82.    Because the two policymakers for the City of Collegedale are the individuals who deprived the Plaintiffs of their Constitutional right to the freedom of speech, the City of Collegedale is liable for the actions of the Chief and the City Manager under 42 U.S.C. § 1983.

83.    The Plaintiffs have suffered damages as a result of this deprivation and are entitled to compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §1988.

### III.    *Count Three – Violation of Tennessee Public Protection Act – City of Collegedale*

84.    The allegations in Paragraphs 1- 83 are incorporated herein by reference.

17

85. Pursuant to T.C.A. § 50-1-304 (codified as the "Tennessee Public Protection Act" or "TPPA" ), it is the public policy of this State that at-will employees may not be discharged solely for refusing to remain silent and/or refusing to participate in the illegal activities of its employer.

86. The administration of the Collegedale Police Department, at the direction of the City Manager Ted Rogers and Chief Hickman, engaged in unlawful activities when it imposed a mandatory quota system as defined by T.C.A. § 39-16-516 within the Department. Further, the Administration of the Department issued verbal directives to the patrol officers that required a certain number of traffic citations and arrests that stem from traffic citations per month.

87. A quota system is in direct violation of the T.C.A. § 39-16-516.

88. Plaintiffs were fully aware of the illegal directive issued by the Department through its command staff, the Chief and the City Manager.

89. Plaintiffs refused to remain silent about the illegal activities by the Department and/or refused to participate in those illegal activities. Plaintiffs took their concerns about these activities to their supervisors, the Chief, two elected officials of the City of Collegedale, Commissioners Ethan White and Debbie Baker, and the Tennessee Bureau of Investigation.

90. Defendant retaliated against and terminated the Plaintiffs for their refusal to remain silent about said illegal activities and/or their refusal to participate in said illegal activities.

91. Plaintiffs have suffered damages as a result of this retaliation and termination and are entitled to compensatory damages, punitive damages, and attorney's fees.

**IV. Count Four – Violation of the Tennessee Public Employee Political Freedom Act- City of Collegedale**

92. The allegations contained in Paragraphs 1-91 are incorporated herein by reference.

18

93. Pursuant to T.C.A. § 8-50-603 (codified as the "Tennessee Public Employee Political Freedom Act" or "PEPFA"), it is unlawful for any public employer to discipline, threaten to discipline, or otherwise discriminate against an employee because such employee exercised that employee's right to communicate with an elected public official.

94. Officers Duckett, Schilling, and Holloway communicated with elected public officials, Commissioner White and Commissioner Baker, about their concerns that the Department had implemented an illegal quota system in violation of T.C.A. § 39-16-516 and began disciplining employees who did not meet the quota. The Plaintiffs communicated their belief that this was illegal to the Commissioners.

95. Chief Hickman, Ted Rogers and the City of Collegedale knew of these communications with the Commissioners prior to their termination on September 6, 2019.

96. The Plaintiffs' communications with elected officials regarding the illegal activities of the Department was a substantial factor in their terminations.

97. The Plaintiffs have suffered damages as a direct result from this violation and are entitled to compensatory damages, treble damages, punitive damages, and attorney's fees.

### V. Count Five – Vicarious Liability/Respondeat Superior

98. The allegations contained in Paragraphs 1-97 are incorporated herein by reference.

99. Plaintiffs submit and aver that the Defendant City of Collegedale is vicariously liable for any and all acts or omissions that were performed by their agents, employees including but not limited to Chief Hickman and City Managers Rogers, and others and pursuant to the doctrine of respondeat superior. Plaintiffs aver that the City of Collegedale, as principal, is vicariously liable for any and all acts, negligent, intentional or otherwise, committed by their employees including but not limited to Chief Hickman and City Manager Rogers.

19

**WHEREFORE PREMISES CONSIDERED,** the Plaintiffs pray for the following:

a. That Defendants be served a copy of this Complaint and be required to answer within the time prescribed by the *Federal Rules of Civil Procedure*;

b. That a Jury be empaneled to determine the issues;

c. That the Court award the Plaintiffs back pay and benefits;

d. That the Court award all front pay and benefits;

e. That the Court award further compensatory damages in the amount of $1,200,000 and punitive damages in the amount of $1,200,000;

f. That the Plaintiffs be awarded treble damages, compensatory damages, and punitive damages pursuant to 42 U.S.C. § 1983, §1988, T.C.A. § 8-50-603;

g. That the Court award attorney's fees pursuant to 42 U.S.C. § 1983, § 1988, T.C.A. §8-50-603, § 50-1-304 and other applicable law;

h. That the Court assess all discretionary and non-discretionary costs and both pre and post-judgment interest against the Defendants;

i. That the Court enter a Permanent Injunction preventing Defendants from acting in a similar or like manner in the future and to issue a permanent injunction barring the City of Collegedale from instituting an illegal quota system;

j. Any other further and general relief to which the Plaintiff would be entitled in the premises.

Respectfully submitted,

**DAVIS & HOSS, P.C.**


\s\ Janie Parks Varnell_____
Janie Parks Varnell, BPR #031256
Bryan H. Hoss, BPR #021529
*Attorneys for the Plaintiffs*
850 Fort Wood Street
Chattanooga, TN 37403
(423) 266-0605
(423) 266-0687 – Fax
janie@davis-hoss.com
bryan@davis-hoss.com

21