IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

---

KOLBY DUCKETT,                         *
DAVID SCHILLING, and                   *
DAVID HOLLOWAY,                        *
                                       *
        Plaintiffs,                    *
                                       *   Docket No.
-vs-                                   *   1:19-cv-00295
                                       *
CHIEF BRIAN HICKMAN,                   *
individually, and in his              *
capacity as the Police Chief of       *
the City of Collegedale,              *
                                       *
TED ROGERS, individually, and in      *
his official capacity as the          *
City Manager of the City of           *
Collegedale, and                      *
                                       *
THE CITY OF COLLEGEDALE,              *
TENNESSEE, a municipality,            *
                                       *
        Defendants.                    *

---

THE DEPOSITION OF
COMMISSIONER ETHAN ANDREW WHITE
September 11, 2020

---

Sue Anne Vaughn, TN LCR #346
Angel & Associates Court Reporting
P.O. BOX 1145
Hixson, Tennessee 37343
Telephone 423-876-4435 and 800-298-DEPO (3376)



EXHIBIT

1    **you?**

2       A    Not that I can recall. To be honest, I can't

3    remember at what point he did tell me about being written

4    up for not meeting the performance standards. I know he

5    mentioned it, but I don't know if it was before January.

6    I just cannot recall.

7       **Q    Is it fair to say that you had multiple**

8    **conversations with Officer Duckett about the performance**

9    **standards?**

10       A    Yes.

11       **Q    Okay. Is it fair to say you had multiple**

12    **conversations with Officer Schilling about the**

13    **performance standards?**

14       A    Yes.

15       **Q    Did they -- did any of these officers mention**

16    **whether they had brought this up to their chain of**

17    **command?**

18       A    Yes, they did.

19       **Q    What did they say about that?**

20       A    They said -- Officer Schilling on my way to

21    work one morning -- I believe it was the morning of

22    January 7 because there was a commission meeting that

23    night -- he had mentioned that he met with his sergeant,

24    I believe it was Sergeant Westfield at the time, and they

25    had discussed that they felt that it was in violation of

1    the T.C.A. code.  I believe Sergeant Westfield informed

2    them that it had been cleared by the city attorney and

3    that they were told, to Sergeant Westfield's

4    understanding, this was legal because the city attorney

5    had cleared it.

6            And so that night -- the reason why I know the

7    time frame is because that evening, Monday, January 7, I

8    believe it was, I approached City Attorney Elliott and

9    showed him a picture of the performance standards that

10   was on the wall and asked him if he had ever seen this or

11   been advised or had been asked.  He said he had never

12   seen this before, and he asked me to send him a copy of

13   it.

14       Q    **Do you remember what month that posting was?**

15   **I mean, do you remember what it said?**

16       A    I believe it was for performance standards for

17   December of 2019 -- 2018.  Sorry.

18            MS. VARNELL:  Do we have the exhibits?

19            MR. GRANT:  Yeah.

20            MR. WELLS:  Right in front of you.

21            MR. GRANT:  Right in front of you.  We hid

22   them.

23            MS. VARNELL:  It's been a long week.

24   BY MS. VARNELL:

25       Q    **Who sent you the picture of the December 2018**

1    stat sheet?

2        A    I saw it myself personally, but I believe also

3    Officer Spain had sent it to me at one point and possibly

4    Officer Schilling and Duckett, but I can't recall.  I

5    mean, I was in city hall and saw it myself, and I believe

6    I'm the one who took a picture at one point.

7        Q    And so you probably -- you think you took a

8    picture of it with your phone?

9        A    Yes.  I do know I took a picture of it, and I

10   believe that's what I sent to City Attorney Elliott.

11       Q    And you think that probably happened on

12   January 7th?

13       A    I know it happened on January 7th because the

14   only time that City Attorney Elliott and I really

15   interact is when we're in a commission meeting.  It was

16   after a commission meeting that I approached him because

17   I was concerned about that becoming an issue and that the

18   officers had gone to their chain of command, and the

19   answer that was given to them was that the city attorney

20   had been consulted.

21            Originally when they approached me, I said, go

22   to your chain of command, you know, report up.  And they

23   did.  They informed me that City Attorney Elliott had

24   been approached.

25            So I went to him and said, hey, have you seen

1   this?

2          He said, no, I have not.  Can you send me a

3   copy of it?

4          **Q      When did Corporal Bedell speak to you?**

5          A      It would have been the night before on

6   January 6, on Sunday evening.  It was -- as he was

7   getting into his patrol car, he mentioned that he felt

8   that it was wrong.  It was very brief because, like I

9   said earlier, Silent Bob doesn't speak much.  So that was

10  the conversation that we had.

11         **Q      Do you know if he -- do you know where he was**

12  **heading?**

13         A      On patrol, I believe.  He was either leaving

14  his shift or heading out for shift.  I'm not aware of

15  their shift schedule, so I can't tell you if he had been

16  in a meeting previously or if he had been on shift, but I

17  do know he was getting into his patrol car.

18         **Q      Do you remember about what time that occurred?**

19         A      It was dark.

20         **Q      It was dark?**

21         A      Yeah.

22         **Q      And you were in the parking lot of city hall?**

23         A      We were right outside the door leading into

24  the police department.

25         **Q      Okay.  And what specifically did he say about**

1  the performance standards?

2      A      That he had a legitimate concern about it.

3      Q      Did he say whether he had taken it to his

4  chain of command?

5      A      Like I said, it was a very brief conversation.

6  He did not talk to me very often because of what I stated

7  earlier.

8      Q      Did he say that he felt like these were

9  illegal?

10             MR. GRANT:   Object to form.

11     A      Yeah.   I mean, my understanding of what his

12 conversation -- my understanding from our conversation

13 was that he felt that there was something wrong about

14 them.

15     Q      Okay.   So after you went to the city attorney,

16 what is the next thing that you remember doing or the

17 next person you remember talking to?

18     A      I talked to City Manager Rogers about it as

19 well, and I believe, though, that was in the morning,

20 Monday morning.   So I talked to City Manager Rogers about

21 it and then talked to the city attorney that evening.

22     Q      Okay.   So just to back up a little bit.   At

23 some point, end of December of 2018 and beginning of

24 January of 2019, I think your testimony is -- or we've

25 talked about four officers who talked to you about this;

| 1 | | **correct? Corporal Bedell?** |
| 2 | A | Yeah. |
| 3 | Q | **David Schilling?** |
| 4 | A | Duckett and Spain, yeah. |
| 5 | Q | **Duckett and Spain?** |
| 6 | A | Yes, ma'am. |
| 7 | Q | **Anybody else?** |
| 8 | A | Not that I can recall. |
| 9 | Q | **Okay. Just those four.** |

10 **And then the last -- the conversation with**
11 **Bedell was the evening of Sunday, the 6th?**

12 A From what I recall, yes.

13 Q **And then that next morning on the 7th is when**
14 **you went to see Ted Rogers?**

15 A No, ma'am. I met up with Officer Schilling at
16 the -- what we call the duck pond there at the
17 university, and we stacked up and talked about his
18 frustration and the fact that they had gone through their
19 chain of command, and I believe Lieutenant Sapp had sent
20 an email out stating that it was still legal and they
21 were going to move forward with it.

22 Q **Okay. So when you talked to Officer Schilling**
23 **that was the morning of the 7th?**

24 A Yes.

25 Q **Okay. And the Lieutenant Sapp email had**

(423) 876-4435    "Preserving The Record"    (800) 298-3376
Sue Anne Vaughn    Angel & Associates Court Reporting
Case 1:19-cv-00295-CHS   Document 75-1   Filed 12/02/20   Page 7 of 19   PageID #: 361

1    already happened by that point?

2        A    From what I recall, yes.

3        Q    Because Officer Schilling was talking to you

4    about that?

5        A    Correct.

6        Q    Did he say anything in particular that you

7    recall about Officer -- I mean, Lieutenant Sapp's email?

8        A    That they had reviewed it, they had felt that

9    it was legal, and that they were going to continue to

10   move forward because it was not a quota because it was

11   called a performance standard; and that they were not

12   calling it a quota, so it was a performance standard.

13           And then he informed me that they had been

14   advised -- I don't know if it was in the email or from

15   Sergeant Westfield, but the city attorney had been

16   approached, had given his blessing on it and said that it

17   was legal.  So they moved forward with it.

18       Q    Did they say who told Sergeant Westfield that

19   the city attorney had been consulted?

20       A    Yes, Chief Hickman.

21       Q    Did they say that Chief Hickman told them that

22   the city attorney okayed it?

23       A    To my understanding, that is what was conveyed

24   to them.

25       Q    When you say "them," we're talking about

1  Sergeant Westfield?

2      A    Yes.

3      Q    Lieutenant Sapp?

4      A    Yes, and the entire department because it was

5  a department-wide email.

6      Q    Okay.  If you'll look at page 39.

7      A    Yes, ma'am.

8      Q    See down at the bottom or maybe two-thirds

9  down the page it says 1/7/19?

10     A    Uh-huh.

11     Q    And, again, these are conversations with David

12 Schilling; correct?

13     A    Yes.

14     Q    Your first message to him at that time or on

15 the date actually was, "City attorney was not consulted"?

16     A    Yes.

17     Q    And the next message is, "He's not happy"?

18     A    Correct.

19     Q    What made you send he's not happy?

20     A    Because he was very irritated that his name

21 was used in correlation with approving a department

22 policy.

23     Q    And, again, he stated he had not been made

24 aware of it?

25     A    Correct.

1      Q    And "he" being the city attorney, Sam Elliott;

2  correct?

3      A    Correct.

4      Q    And then at the bottom David Schilling says,

5  "Oh, my...  Westfield said he thought they called an

6  attorney, but he didn't know who it was they called";

7  correct?

8      A    Yes.

9      Q    Do you know who he's referring to by "they,"

10  who "they" called?

11      A    I'm not -- I mean, that's not my job to guess

12  what Officer Schilling meant there.

13      Q    All right.  So then the next page, on page 40,

14  we're still on January 7 at -- it looks like in the

15  evening, 6:31 p.m.; correct?

16      A    Yes.

17      Q    Your first message to David Schilling is,

18  "Well, shits 'bout to hit the fan."  See that?

19      A    Yes.

20      Q    And we've got an emoji following that.  And

21  then, "Ted's talking to Hickman about it tomorrow.  I

22  showed him the board posting."

23      A    Yes.

24      Q    In your conversation with Ted Rogers, other

25  than showing him the board posting, anything else you

1    remember about that conversation with him?

2         A    He claimed that he was not aware of what was

3    going on in the department in regards to performance

4    standards but that he knew that they were working on

5    something to create productivity, because up until then

6    the commission, like I said earlier on, had talked about

7    lack of seeing patrol out in the neighborhoods and

8    different things like that.  That's what we had

9    discussed.

10              But he's like, I do not know -- he was not

11   aware of any kind of quota, and he did not believe it was

12   a quota.

13        Q    Did you show him any of the pictures of the

14   stat sheets that you had gotten from officers?

15        A    Yes, because I took a picture of it myself and

16   showed him.

17        Q    And did you show him any of the other pictures

18   or stat sheets that had been provided to you?

19        A    No, not that I -- I can't recall.

20        Q    Did you tell him that officers had come to you

21   about this?

22        A    Yes.

23        Q    Did you tell him specific officers?

24        A    Not that I can recall.

25        Q    Did he ask you which specific officers had

1    come to you?

2          A      Not that I can recall.

3          Q      Do you remember mentioning any of their names

4    at all?

5          A      In that meeting?

6          Q      Uh-huh.

7          A      Not that I can recall.

8          Q      Okay.  Skip down to -- well, David Schilling

9    responds and says, "Oh, no...  Lol."

10                And then you say, "I told him it's coming from

11   Jamie and that from my opinion he needs to find new

12   employment."

13                Do you recall -- or who's Jamie?

14         A      That would be Sergeant Heath.

15         Q      And do you know why you told him that it's

16   coming from Jamie?

17         A      I cannot recall.

18         Q      Was that the -- was that something that was

19   told to you, that these performance standards came from

20   Sergeant Heath?

21         A      I cannot recall.

22         Q      You don't recall that?

23         A      No.

24         Q      Do you recall telling him that Sergeant Heath

25   needed to find new employment?

1    A    Yes, I do recall that because I felt that

2    Sergeant Heath was undermining Chief Hickman's authority

3    at the time.

4         **Q    What do you mean by that?**

5    A    Ted Rogers and I had had conversations about

6    the problems going on in the department, and him and I

7    both felt that somebody was undermining Chief Hickman's

8    authority inside the department because Chief Hickman was

9    gone a lot, because he teaches across the state or his

10   involvement with the fire department, and that Jamie

11   Heath had stepped in to do different things.

12        **Q    Okay.  And specific to the performance**

13   **standards, did you think that was a reason why Sergeant**

14   **Heath may need to find new employment?**

15   A    I don't want to speculate as to what I was

16   thinking at that point, no, ma'am.

17        MR. LAUDERBACK:  Can you speak up a little

18   bit?  When that air kicks on, it's kind of --

19        THE WITNESS:  Oh, okay.  Sorry.  Yeah.

20        MR. LAUDERBACK:  You're kind of soft-spoken.

21        THE WITNESS:  I'll speak up.  My apologies.

22        MR. LAUDERBACK:  She won't be offended.

23        MS. VARNELL:  I won't.

24        MR. BIBB:  That's why I'm creepily sitting

25   right here.

1          THE WITNESS:  I was wondering why you joined

2     me over here.

3          MR. BIBB:  It's like, I'm just going to get

4     right next to you.  We'll be friendly.

5     BY MS. VARNELL:

6          Q     Okay.  On page 41, we've got -- you start at

7     the top of the page.  You say, "Well, Sam is not happy";

8     correct?

9          A     Uh-huh.

10         Q     And then David Schilling says, "Sam?"  And you

11    say, "City attorney."

12         A     Yes, ma'am.

13         Q     All right.  And that's still following your

14    conversation that we've already discussed that you had

15    with Sam Elliott on the 7th?

16         A     Yes, ma'am.

17         Q     And you say that Sam Elliott wanted me to send

18    him a pic of the paper.  Are you talking about the stat

19    sheet?

20         A     Yes, ma'am.

21         Q     And "he hasn't been consulted."

22         A     Yes, ma'am.

23         Q     Schilling says, I'd send you the email

24    received -- I think it's supposed to say received

25    today -- but don't want to lose my job.  See that?

1      A    Yes.

2      Q    **Again, was that something that he feared, of**

3  **losing his job by sending department emails or talking to**

4  **a commissioner?**

5          MR. GRANT:  Object.

6          MR. BIBB:  Object to the form of the question.

7  BY MS. VARNELL:

8      Q    **Go ahead.**

9      A    Yes.

10     Q    **And you say, "Also Ted is going to ask why**

11  **nothing's been asked of us for external vest carriers."**

12  **That's the outer carrier that you were talking about**

13  **earlier; right?**

14     A    Yes, ma'am.

15     Q    **And then you said, "Ted said no one will lose**

16  **job.  Lol."**

17     A    Yes.

18     Q    **Do you remember when he said that?**

19     A    That would have been in the meeting that I

20  talked to him because I had told him that there was some

21  kind of worry that somebody could be retaliated against

22  but nothing specifically.  I never mentioned any

23  officers' names that I recall.  But Ted assured me that

24  any officer that would speak with me would never lose

25  their job because they were protected under the City

(423) 876-4435         "Preserving The Record"        (800) 298-3376
Sue Anne Vaughn      Angel & Associates Court Reporting
Case 1:19-cv-00295-CHS   Document 75-1   Filed 12/02/20   Page 15 of 19   PageID #: 369

1    handbook, personnel file.

2          Q      And he said that to you in that meeting on

3    the 7th?

4          A      Yes.

5          Q      What is the next thing after the 7th do you

6    remember happening or any conversations that you had with

7    anyone in the department about the quota, let's say, on

8    January 8th?  Do you remember anything specific?

9          A      I remember receiving an email saying that it

10   was not -- the performance standard looked like a quota.

11   It was a quota.  It needed to cease immediately.

12         Q      Okay.  And who sent that email?

13         A      City Attorney Elliott.

14         Q      Was that email to you?

15         A      Yes.

16         Q      To anyone else?

17         A      I can't recall, but it was sent to me.  If I

18   remember correctly, I believe City Manager Rogers was

19   cc'd on it, but I can't recall.

20         Q      Was Chief Hickman?

21         A      I cannot recall.

22         Q      Did you tell anyone about this email and the

23   contents of it?

24         A      The TBI.

25         Q      The TBI?

1     A     Yes, ma'am.

2     **Q     Anyone else?**

3     A     I believe I mentioned it to Officer Schilling,

4  yes.

5     **Q     I want to show you page 44 of this text**

6  **message.**

7     A     Yes.

8     **Q     See at the top your message that says, "City**

9  **attorney has emailed myself and Ted, stating the policy**

10  **needs to be ceased immediately"?**

11     A     Yes.

12     **Q     Okay.  Is that the email you're talking about?**

13     A     Yes.

14     **Q     And down at the bottom it looks to be a**

15  **picture?**

16     A     Yes, ma'am.

17     **Q     What is in that picture?**

18     A     It looks like a snippet of the city attorney's

19  response.

20     **Q     Can you read that for me?**

21     A     "What I am seeing in what you transmitted is

22  the description of patrol activities and enforcement

23  activities, along with the words minimum requirements for

24  a specified period of a month.  That clearly translates

25  into a predetermined or specified number that is within a

1    specified period.  The policy or practice should be

2    ceased immediately."

3        Q    **And under that you say, "That's what he sent**

4    **me."**

5        A    Yes, ma'am.

6            MR. BIBB:  Janie, I want to understand --

7    we've got the text messages here.  But just for the

8    record, I want to reassert and preserve the objection

9    that we have asserted on behalf of Chief Hickman at

10   earlier stages of these proceedings regarding the

11   attorney-client privilege status of those communications.

12   I understand you're going to ask him about it, but I want

13   to make sure that we're going to assert that right and

14   not waiving that right at this stage.

15           MS. VARNELL:  Right.  And we are actually

16   going to preserve any future litigation that may have to

17   come of that as well or any issue that we may --

18           MR. BIBB:  I'm sure we'll have to have a

19   motion argued on that at one point or another.

20           MS. VARNELL:  Sure.

21           MR. BIBB:  But I just want to make sure that

22   I'm -- you know, it's in the text.  We'll talk about it,

23   but that we're preserving that right.

24           MS. VARNELL:  Sure.

25           MR. GRANT:  And the same for the City.  We've

1    asserted that objection.

2              MS. VARNELL:  Yes.

3              MR. GRANT:  The same objection for the City.

4    BY MS. VARNELL:

5        Q    All right.  And that was sent on the 8th.

6    That text message you sent to David Schilling was on

7    January 8th?

8        A    Yes, ma'am.

9        Q    Do you remember seeing an email that Chief

10   Hickman sent out on January 8th about the performance

11   standards?

12       A    I don't recall.

13       Q    Do you remember hearing that Chief Hickman

14   sent out an email on January 8th basically saying the

15   enforcement activities were not going to be enforced

16   anymore?

17       A    Yes.  I was informed of that.

18       Q    Who told you that?

19       A    Officer Schilling, I believe.

20       Q    Did he tell you that on the 8th?  Do you

21   remember?

22       A    I believe so.

23       Q    All right.  If you'll go to page 45, the next

24   page.

25       A    Yes, ma'am.